**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PATRICIA KILBY-ROBB,<br><br>                    Plaintiff,<br><br>          v.<br><br>LINDA MCMAHON, *Official Capacity as Secretary of Education*,[1]<br><br>                    Defendant. | Case No. 20-cv-992 (JMC) |

**MEMORANDUM OPINION**

Plaintiff Patricia Kilby-Robb brings this employment discrimination action against the U.S. Department of Education ("the Department"). Kilby-Robb alleges that the Department violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633a(a), by giving her a low performance review, denying her leave restoration request, denying her teleworking request, and rejecting her application for three vacant positions. ECF 1. The Department moves for summary judgment, on the grounds that it had legitimate, nondiscriminatory reasons for its decisions. ECF 8. For the reasons discussed below, the Court will **GRANT** the Department's motion and **DISMISS** the case.[2]

---

[1] Linda McMahon, the current Secretary of Education, is automatically substituted as the Defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

### A.  Factual Background

The following facts are undisputed except where noted. Patricia Kilby-Robb, born in 1948, is an African-American woman. ECF 10-6 at 26. During the relevant time period, Kilby-Robb worked in the United States Department of Education's Office of Innovation and Improvement, within the Charter Schools Program ("CSP") subdivision, as an Education Program Specialist.[3] ECF 8-1 ¶¶ 1–3. Stefan Huh was Kilby-Robb's immediate supervisor. ECF 8-1 ¶ 4. Margo Anderson was Kilby-Robb's second-line supervisor and Huh's immediate supervisor. *Id.* ¶ 5.

### 1.  *2013 Performance Evaluation by Stefan Huh*

In 2013, employees in the Office of Innovation and Improvement were evaluated under a system called "REACH." ECF 8-1 ¶ 7; ECF 8-7 at 4–8. Under this system, an immediate supervisor rates the employee's performance on certain "critical elements." ECF 8-7 at 4. Critical elements are defined as "critical" "work assignment[s] or responsibilit[ies]," which support the Department's "strategic goal[s]" and "organizational priorit[ies]." *Id.* Supervisors can choose to assign varying weights to each critical element. *Id.* at 15. An employee's immediate supervisor is responsible for assessing performance, writing up the evaluation, and scoring the employee. *Id.* at 7–8. A senior officer approves the supervisor's rating. *Id.* at 8. In the assessment, the supervisor rates the employee's performance of each element on a four-level scale, with each rating corresponding to a numerical point value: Exceptional Results (3), High Results (2), Results Achieved (1), and Unsatisfactory Results (0). ECF 8-1 ¶¶ 8–12. The scores on each element are then multiplied by their weighted percentage and combined to arrive at a final "summary rating," which shares a similar "Exceptional Results" to "Unsatisfactory" scale. ECF 8-7 at 31. An

---

[3] The Office of Innovation and Improvement was consolidated with the Office of Elementary and Secondary Education in 2019. ECF 8-1 ¶ 1

"Exceptional Results" rating equates to an "Outstanding" rating under the Office of Personnel Management's civil service rating system. ECF 8-7 at 7; *see* 5 C.F.R. § 430.208(d)(2)(iv).

Stefan Huh was Kilby-Robb's rater for the performance evaluation period running from October 1, 2012 to September 30, 2013. ECF 8-1 ¶ 17. During that period, Kilby-Robb was rated on three critical elements: grant management (weighted at 40%), contract management (weighted at 40%), and data and evidence management (weighted at 20%). ECF 8-10 at 4–6. Kilby-Robb claims that in June 2013, during a mid-year discussion with Huh regarding her performance, ECF 1 ¶ 16; ECF 8-1 ¶ 16, Huh "led [her] to believe . . . that she was meeting the 'outstanding requirement' level," and that Huh at various times "told [her] to keep doing what she was doing." ECF 10-6 at 253; *see* ECF 10-1 ¶¶ 15–16. However, when Huh submitted his proposed rating of Kilby-Robb for the period, he rated the critical elements as follows: grant management (1), contract management (2), and data and evidence management (2), which resulted in Kilby-Robb receiving an overall summary rating of 1.6 ("Results Achieved"), contrary to her expectation. ECF 8-10 at 4–6. Kilby-Robb believes that Huh downplayed her accomplishments in each of the three critical elements. ECF 10-1 ¶¶ 18–20. Margo Anderson approved Huh's rating on December 5, 2013. ECF 8-1 ¶ 22.

### 2. *Denial of Restoration of Leave Request*

In January 2014, Kilby-Robb requested that the Department restore her forfeited annual leave time. *See* ECF 8-1 ¶ 33; ECF 8-4 at 7. Under then-current Agency policies, employees were limited in the amount of annual leave they could accrue and carry forward into the subsequent year. ECF 8-11 at 6–7. Annual leave in excess of 240 hours would be forfeited if not used by the end of the leave year. ECF 8-1 ¶ 23. The rollover deadline for the 2013 leave year was January 11, 2014. *Id.* ¶ 24. However, an employee who failed to use leave hours that were forfeited could

request to restore those hours under certain conditions, including when the leave hours were (1) scheduled in the prior leave year, meaning that they were initially approved for use but (2) the "use [was] denied because of exigencies (situations calling for immediate action or attention) of the public business." *Id.* ¶ 23. Put another way, if the employee had an approved leave request scheduled in the prior leave year, but was later unable to use that leave because the Department needed the employee to work on time-sensitive tasks on the days they had planned to take that leave, the employee was allowed to request that their leave be restored for use in the next leave year. ECF 8-11 at 7–8. Only "an agency head or someone designated by the agency" had the authority to determine whether an employee's circumstance [was] exigent. *Id.* at 8.

By November 2013, Kilby-Robb had accrued at least 459 hours of annual leave. ECF 8-1 ¶ 26 (listing 91 hours of restored annual leave accrued from the prior leave year and 368 hours of annual leave). Employees in Kilby-Robb's office were told that "employees must schedule their use-or-lose annual leave by November 30, 2013." *Id.* ¶ 25. And indeed, before that deadline, Kilby-Robb scheduled various leave requests through the early days of the new year. First, Kilby-Robb requested to use 145 of her accrued hours on dates that occurred before the January 11 rollover date. *Id.* ¶¶ 27–32. All these requests to use leave were approved, and Kilby-Robb's timesheets reflect that she in fact used the leave on each of those dates, with the exception of four days (approximately 40 hours) on which she instead reported to work. ECF 8-14 at 4, 6, 8–9. Second, Kilby-Robb also requested to use an additional 140 hours of her leave in January and February 2014 on dates that were after the January 11 deadline. ECF 8-1 ¶ 30. Those requests were also approved. *Id.*

In January 2014, Kilby-Robb submitted a request to restore forfeited annual leave from June 1, 2013 to December 31, 2013. ECF 8-16 at 2. In her request, Kilby-Robb stated that she had

4

to forego using 160 hours of scheduled leave in the 2013 leave year due to an "[e]xigency of [p]ublic [b]usiness." *Id.* Her request stated that she had to go into work on days where she had scheduled leave in order to complete tasks related to "two essential monitoring, data collection, and risk management contracts," and other "time sensitive" tasks. *Id.* Kilby-Robb claims that before submitting her restoration of leave request, and while scheduling her various uses of leave in this period, she spoke with employees in the Office of Innovation and Improvement who provided her guidance regarding how to preserve her 2013 unused leave hours and use them for dates in the 2014 leave year. ECF 10-6 at 71–72, 259; ECF 10 at 10–11.

The request first went to Stefan Huh, who initially approved it. ECF 8-16 at 3. However, Kilby-Robb also needed approvals and signatures from an executive officer, in this case, Liza Araujo, and a senior office, Anderson, to have her leave successfully restored. *Id.*; *see, e.g.*, ECF 8-19 (leave restoration form for other employee showing Araujo and Anderson as executive officer and senior officer, respectively); ECF 8-20 (same). After talking with Araujo, Huh reversed course and denied the request. ECF 8-4 at 7–8. Huh says that Araujo informed him that Kilby-Robb had not followed the proper process to restore leave. *Id.* at 8. As Araujo later told Kilby-Robb, restoration of leave was only available for "use or lose leave that was scheduled (and denied) through January 11, 2014." ECF 8-17 at 2. And while Kilby-Robb's timesheets demonstrate that she did come in to work on at least four different days before January 11 when she had previously scheduled leave, ECF 8-1 ¶¶ 26–30; ECF 8-14 at 4, 6, 8–9, the record does not reflect that Kilby-Robb came into work those days because her leave requests had been denied, *see* ECF 8-1 ¶ 36 (stating that "[n]one of [Kilby-Robb's] requests to use leave were denied during th[e] period" leading up to January 11); ECF 10-1 ¶ 36 (failing to dispute this fact). Kilby-Robb claims that following Huh's denial of her request, she spoke with a Human Resources employee, Naomi

5

Sanchez, who agreed to approve the restoration of leave, but the request was denied—this time purportedly by Margo Anderson. ECF 10-6 at 253.[4]

Around the same time, other employees in Kilby-Robb's office had their restoration of leave requests approved. *See* ECF 8-1 ¶¶ 37–40. In each of those cases, the employees had made requests to use leave before January 11, 2014, which had initially been scheduled and approved, but were subsequently denied, on the grounds that the employees were required by their supervisors to work during those hours. *See id.*; ECF 10-1 ¶¶ 37–40.

### 3. *Teleworking*

On January 14, 2014, Kilby-Robb asked to work from home for an additional day each week. ECF 8-1 ¶ 45. Under the Department's then-current teleworking policy (known as the Flexiplace program), certain Agency employees were permitted to work at home during an agreed-upon portion of their work week. ECF 8-22 at 3. According to the documents governing the program, participation in telework was a "benefit, [and] not a right." *Id.* at 4. Employees could request to participate in the program, with the approval of their immediate supervisor. *Id.* If approved, the employee and supervisor would sign an agreement regarding the terms of the employee's telework. *Id.* at 8. The employee's participation in the program would also be approved by a more senior official. *Id.* at 6. The Department's Flexiplace program manual did not set a specific required balance of in-office and out-of-office work—it left such decisions up to individual supervisors based on the agreement reached with the employee. *Id.* at 8 ("Work away

---

[4] In support of her assertions regarding this conversation with Sanchez and Anderson's involvement, Kilby-Robb cites to her own statements made in her EEO Investigative Affidavit, ECF 10-6 at 253. She also cites to various other record materials that the Court has not been able to identify, and therefore to verify their contents as supporting evidence. *See* ECF 10 at 11–12 (citing among others, Plaintiff's Exhibit E at ROI00910, ROI00912 and ROI00916, to support her account of Huh's reversal of his initial decision and Sanchez's purported approval of her restoration of leave); *see also* ECF 10-6 at 271–72 (including what appears to be the relevant summary judgment record but skipping from page "00892" to "01051"). "[T]he district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make its own analysis of what may, or may not, be a genuine issue of material disputed fact." *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009).

from the office will vary depending on the individual arrangements between employees and their supervisors.").

On January 15, Huh denied Kilby-Robb's request for an additional telework day. ECF 8-24 at 2. At the time Kilby-Robb submitted her request, she was on a "compressed schedule," working ten-hour days for four days of the work week. ECF 8-1 ¶ 46; ECF 10-1 ¶ 46. Of those four days, she was on-site for three days and worked remotely for one. *Id.* Her requested schedule would have allowed Kilby-Robb to be in the office for only two days of the week. ECF 8-23 at 2. Huh told Kilby-Robb at the time that he was "only able to approve" her "to be away from the office twice a week." ECF 8-24 at 2. According to Huh and Anderson, employees in the CSP division, as a "general policy," had to be on-site at least three working days to effectively perform their duties. ECF 8-4 at 9; *see* ECF 8-5 at 8. Kilby-Robb disputes that this "general policy" existed. ECF 10-1 ¶ 44. The only employee in the CSP division who teleworked two days a week was Soumya Sathya, a South Asian woman in her mid-30s. ECF 8-4 at 11. Sathya also reported to Huh, but she did not work on a compressed schedule, meaning that she was in-person three out of five working days. ECF 8-25. Another employee in the Office of Improvement and Innovation, Christine Miller, a Caucasian woman younger than Kilby-Robb, worked remotely as a Program Analyst, albeit in the Teacher Quality Programs ("TQP") office, with the approval of her immediate supervisor, Venetia Richardson. ECF 10-6 at 109; ECF 8-4 at 10; ECF 12-4 at 1–2.

### 4. *Non-selection*

Around April 2014, Kilby-Robb applied to three vacant positions within the Office of Innovation and Improvement but was not selected. The first position (OII-2014-0014) required candidates to have one year of specialized experience at the GS-13 level with "strategic and program planning, budget development, and management operations." ECF 8-1 ¶ 51. Theresa

Ralidak, the Human Resources specialist, reviewed the applications to make an initial qualifications determination and referred them to Liza Araujo, the selecting official. *Id.* ¶¶ 54–55. Ralidak did not refer Kilby-Robb's application to Araujo. *Id.* ¶¶ 58–59. Instead, she only referred Ann Margaret Owens, a Caucasian woman then in her thirties, who Araujo then selected for the position. *Id.* ¶¶ 41, 58, 60; ECF 10 at 15.[5] Ralidak states that she declined to pass on Kilby-Robb's application because Kilby-Robb was not qualified for the position. ECF 8-28 at 5. Per Ralidak, Kilby-Robb's resume did not reflect that she had the requisite "specialized experience" as provided in the listing. *Id.* Kilby-Robb disputes this, and claims that she had over twenty-five years of experience in "management and strategic planning," ECF 10-1 ¶ 56. However, Kilby-Robb does not dispute that Ralidak did not know her race or age while making the initial determinations. ECF 8-1 ¶ 61; ECF 10-1 ¶ 61; ECF 8-28 at 3–4, 6–7.

Kilby-Robb applied for another vacant position (OII-2014-0012), which required candidates to have one year of "specialized experience" at the GS-13 level or its equivalent in "representing a Federal agency on place-based interagency initiatives and analyzing and developing Federal education legislation and policies that seek to transform low-income neighborhoods." ECF 8-32 at 3. Applicants had to respond to a series of questions, one of which asked whether the applicant had such experience for at least one year. ECF 8-32 at 6. Kilby-Robb answered "No." ECF 8-51 at 5. Ralidak again made the initial qualifications determination before referring qualified applicants to the selecting official, Anna Hinton. ECF 8-1 ¶¶ 70–71; ECF 10-1 ¶¶ 70–71. Ralidak states that she screened out Kilby-Robb's application because she had answered "No" to "one of the questions" used to determine eligibility for the position. ECF 8-28 at 9. Jane

---

[5] Kilby-Robb describes Owens as being in her "thirties" in her summary judgment briefing, although she does not cite any record evidence for the proposition. ECF 10 at 15. Nevertheless, the Department does not dispute that Owens was in her thirties, or at any rate, a "younger Caucasian employee." ECF 10-6 at 10.

Hodgdon, a Caucasian woman younger than Kilby-Robb, was initially deemed qualified and eventually selected for this position. ECF 8-35 at 2.[6]

Kilby-Robb applied and received an interview for a final vacant position (OII-2014-0016). *See* ECF 8-1 ¶¶ 78, 84–86. Hinton assembled a three-person panel, who interviewed three qualified candidates and made the final selection. *Id.* ¶¶ 83, 85. Each candidate was asked the same questions and was rated on the same scale. *Id.* ¶ 87. In the standardized interview evaluation form, the notes—representing the combined views of the panelists—state that the interviewers found Kilby-Robb's answers to be lacking, vague, or not on point. *Id.*; ECF 8-55 at 2–3. They also noted that she failed to provide sufficient examples when asked to discuss her experiences as it related to the job position. *Id.* Jeanne Gilroy, a Caucasian woman then in her mid-thirties, was selected for the position over Kilby-Robb. ECF 8-43 at 2; ECF 10-6 at 12.

### B. Procedural Background

Kilby-Robb filed this suit against the Department of Education in December 2020, naming the Secretary of Education as Defendant. ECF 1. Her complaint alleges that the 2013 evaluation by Huh, the denial of her request to restore leave, the denial of the additional telework day, and her rejection for the three vacancies all constituted unlawful disparate treatment under Title VII and the ADEA. *Id.* ¶¶ 44, 49. The Department moved for summary judgment, and Kilby-Robb opposed. ECF 8; ECF 10.

---

[6] Kilby-Robb does not provide Hodgdon's age, and simply describes her as a Caucasian employee "younger" than Kilby-Robb. ECF 10-6 at 38. However, the Department does not dispute Kilby-Robb's characterization of Hodgdon's age and race.

## II.    LEGAL STANDARD

### A.  Summary Judgment

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "may neither make credibility determinations nor weigh the evidence." *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018). "Instead, summary judgment is proper only when, viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences accordingly, no reasonable jury could find in the plaintiff's favor." *Id.* However, it is "well established that the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of its position.'" *Williams v. Verizon Wash., D.C. Inc.*, 304 F. Supp. 3d 183, 191 (D.D.C. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "A mere unsubstantiated allegation creates no genuine issue of fact and will not withstand summary judgment." *Ginger v. District of Columbia*, 527 F.3d 1340, 1347 (D.C. Cir. 2008).

### B.  Title VII and ADEA

Title VII's federal employment provision protects employees from "discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Similarly, the ADEA prohibits federal employers from discriminating on the basis of age against individuals over forty years old. 29 U.S.C. § 633a(a).

"For purposes of summary judgment, the operative question . . . under the Title VII anti-discrimination framework," as well as that of the ADEA, "is whether the employee produced sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against the employee on the basis of" a prohibited characteristic—in this case, race or age. *Ayissi-*

*Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying Title VII framework to ADEA claims). To make out a claim, a plaintiff may offer direct or indirect evidence. *See Ayissi Etoh*, 712 F.3d at 576. When there is only indirect evidence of discrimination, the familiar *McDonnell Douglas* framework applies. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999) (applying *McDonnell Douglas* to Title VII and ADEA claims). Under this framework, a plaintiff must make a *prima facie* showing of discrimination, at which point the burden shifts to the defendant to offer "legitimate, non-discriminatory reason[s] for the challenged employment decision." *DeJesus v. WP Co. LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016).

If the employer meets this burden and articulates a nondiscriminatory reason for an employment action, the *McDonnell Douglas* framework falls away. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008). At that point, the Court simply inquires whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason[,] and that the employer intentionally discriminated against the employee[.]" *Id.* at 494; *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (applying *Brady* for claims under the ADEA).

## III.   ANALYSIS

### A.  Low Performance Review

Kilby-Robb first argues that Huh and Anderson gave her a lower-than-merited rating in her 2013 performance evaluation (a 1.6 rating of "Results Achieved") based on her race and age. ECF 10 at 19. For its part, the Department argues that it had legitimate, nondiscriminatory reasons for the rating. ECF 8 at 7. The Court concludes that the Department is entitled to summary judgment on this claim.

### 1. *Direct evidence of discrimination*

Kilby-Robb first contends to have "direct evidence of discrimination" supporting this claim. ECF 10 at 22. Such evidence "usually takes the form of a statement that itself shows bias against a protected class in the employment decision." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020). Kilby-Robb points to two derogatory comments made during her time at the Department which regarded race and age. First, Kilby-Robb claims that during a meeting about hiring and promotions in 2004, a member of Margo Anderson's executive team said, in Anderson and Kilby-Robb's presence, that "they would hire more African American males if they could find any who are competent." ECF 10-5 ¶ 8. Second, in 2010, another employee purportedly told Kilby-Robb about his conversation with Anderson regarding his non-selection for a position, where Anderson said that "there were African American males that did not deserve to be promoted." ECF 10-5 ¶ 9.

The Court finds no "direct evidence of discrimination" that would "entitle [Kilby-Robb] to a jury trial." *Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Kilby-Robb ignores that to be direct evidence, the cited discriminatory remarks need to show "bias in *the decision*" in question. *Id.* (emphasis added); *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C.) (requiring "a nexus between the . . . remark and the adverse employment action"), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997). The Court cannot consider Anderson's subordinate's purported remark as direct evidence of discrimination in Kilby-Robb's 2013 rating because it was made by a person with no involvement in the performance review process. *See Oviedo*, 948 F.3d at 394–95. Moreover, the remark, made nine years before Kilby-Robb received her low performance review in 2013, is too far back in time to establish a causal link between it and the employment action. *See Kalekiristos*, 958 F. Supp. at 665 (suggesting that temporal proximity between a

12

decision-maker's derogatory statement and the adverse employment action is a factor in determining whether a statement constitutes direct evidence of discrimination); *McArdle v. District of Columbia*, No. 19-cv-3637, 2025 WL 1167956, at *5 (D.D.C. Apr. 22, 2025) (holding that although plaintiff's supervisor's comments were "facially discriminatory and wholly inappropriate," there was no causal connection between the supervisor's decision to transfer plaintiff and the remark).

The Court also cannot consider the purported statement by Anderson that "African American males did not deserve to be promoted" as direct evidence of discrimination. ECF 10-5 ¶ 9. This Court may only consider evidence that can eventually be converted into admissible form at trial. *Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1315 (D.C. Cir. 2021). Kilby-Robb's only evidence for this remark is to her own declaration, which states what another employee told her about what Anderson said to him. ECF 10-5 ¶ 9. This statement, embedded in hearsay, cannot be relied on to generate a genuine dispute of fact to survive summary judgment. *See Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 97–98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020); *Klayman*, 6 F.4th at 1315 ("[W]hen proffered evidence is sheer hearsay, it counts for nothing on summary judgment."); *see Howard v. Fed. Express Corp.*, 316 F. Supp. 3d 234, 240, 245 (D.D.C. 2018) (finding that similar statements of a third party purportedly relayed to the plaintiff by an intermediary were disregarded at summary judgment when "the only evidence of the conversation . . . on the record c[ame] from" the plaintiff's testimony, and neither of the other two individuals were deposed). The Court finds no evidence of direct discrimination that supports a denial of summary judgment on this claim.

### 2. *Indirect evidence of discrimination*

The Department contends that Huh had a legitimate, non-discriminatory reason to issue Kilby-Robb a numerical rating of 1.6 out of three (a "Results Achieved"), namely, that it was a fair assessment of her performance. ECF 8 at 7–9. The Department's policies state that a "Results Achieved" is given when "standards are met; work products and services are sufficient"; the "employee demonstrates an understanding of current procedures"; and the "employee delivers quality products . . . that support the Department's mission." ECF 8-7 at 6. Huh's review provided detailed justifications of Kilby-Robb's performance under each of the three critical elements, concluding that, overall, "Ms. Kilby-Robb achieved the expected results of her performance plan and in many instances produced work of high quality exceeding basic results." ECF 8-10 at 6. Since Huh's justifications are detailed about Kilby-Robb's skills and accomplishments, and in line with the language found in the policy, the Court finds the Department's reasoning "facially credible in light of the proffered evidence." *Figueroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019); *see Ramseur v. Perez*, 80 F. Supp. 3d 58, 73 (D.D.C. 2015).

The burden therefore shifts to Kilby-Robb to show that the Department's proffered reason for its decision was pretextual. *See Brady*, 520 F.3d at 494. An employee may "cast doubt on an employer's asserted reason" for the action by pointing to "changes and inconsistencies in the stated reasons for the adverse action," or a "failure to follow established procedures or criteria." *Id.* at 495 n.3. But an employee's subjective belief that a supervisor should have given them a higher rating is immaterial to establishing pretext. *See Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 73 (D.D.C. 2015) (noting that only the decision-maker's perception, not the plaintiff's "subjective assessment of her own qualifications," is relevant in establishing that a proffered reason is pretextual), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015).

14

To begin, Kilby-Robb attempts to demonstrate inconsistencies in Huh's review. She notes that despite receiving a "Results Achieved," summary rating (the second to lowest category of rating, above "Unsatisfactory"), Huh did not have a single negative comment about her performance. ECF 10 at 23; *see* ECF 8-10 at 2–6. Kilby-Robb also argues that Huh's written feedback on each of her critical elements is inconsistent with the rating he assigned for each element. *See* ECF 10 at 23. In Kilby-Robb's view, "Huh's justifications regarding [her] performance suggest she should have been rated at either a level two ("High Results Achieved") or three ("Exceptional Results Achieved") for each element, rather than the level two and level one ("Results Achieved") ratings that she received. *Id.*

Kilby-Robb's purported inconsistencies are unpersuasive for several reasons. As for the lack of any negative comments in her performance review, a "Results Achieved" summary score is entirely consistent with a positive performance review. Rather, this score may be assigned when "standards are met" and the "employee delivers quality products . . . that support the Department's mission." ECF 8-7 at 6. Nor is Huh's written feedback on each of Kilby-Robb's critical elements inconsistent with the score he assigned to each element. Kilby-Robb's lowest-ranked element was grant management ("Results Achieved"). ECF 8-10 at 4. Huh's feedback states that Kilby-Robb "ensured that appropriate grants management processes . . . were completed in accordance with departmental regulations, policies, guidelines, and in support of [the office's] mission." *Id.* All of this feedback is facially consistent with the "Results Achieved" rating. *See* ECF 8-7 at 6. Kilby-Robb seizes on Huh's statement that she "demonstrated tremendous initiative in advancing her own professional development" by participating in the "Grants Management Certification Program," ECF 8-10 at 4, which in her view, indicates that she should have been ranked higher, ECF 10 at 23. Kilby-Robb ignores that the "tremendous initiative" language is not applied to her

15

performance of the "grants management processes," as a whole, but to only her professional development activities. ECF 8-10 at 4. In contrast, the description of Kilby-Robb's handling of her grants tasks reflects Huh's view that she did a good job of meeting expectations—but not going beyond those expectations—consistent with a "Results Achieved" rating on that element. *See* ECF 8-7 at 6.

Huh ranked Kilby-Robb's other two elements, "contracts management" and "data and evidence management," at a "High Results Achieved" (level two). ECF 8-10 at 5–6. "High Results Achieved" requires that "nearly all work products and services demonstrate the employee's [thorough] knowledge of current procedures, policies, and/or practices." ECF 8-7 at 32. Huh acknowledged that Kilby-Robb had "expert knowledge" in the contracting field, ECF 8-10 at 6, and provided specific examples of her performance, *id.* at 5. With respect to her performance in data management, Huh again gave her a score of two, pointing to consistent, high-quality work. *See* ECF 8-10 at 5. Contrary to Kilby-Robb's claim that these reviews obliged Huh to give her a level three "Exceptional Results Achieved" ranking for those elements, ECF 10 at 23, these descriptions are consistent with a "High Results Achieved" ranking as described in the REACH rating system manual. *See* ECF 8-7 at 32. Without these purported inconsistencies between Huh's descriptions of Kilby-Robb's work and the ratings he assigned, Kilby-Robb's argument on this point boils down to her belief that Huh should have rated her higher based on the same facts. But this cannot suffice to show pretext. Again, it is the perception of the decision-maker that is relevant to determining pretext, not a plaintiff's perception of her performance. *Mokhtar*, 83 F. Supp. 3d at 73.

An employee may also show pretext by demonstrating that the "employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*,

520 F.3d at 495. Kilby-Robb argues that in making his ratings, Huh downplayed or ignored work within each of the three critical elements in order to give her a lower score. ECF 10 at 23. Kilby-Robb states in her opposition that Huh excluded "a large number of her accomplishments" in 2013, but cites to no evidence for that proposition.[7] *Id.* In her response to the Department's interrogatories, Kilby-Robb notes a few accomplishments that appear to be missing from her evaluation: "[she] worked independently with EDGB/DST/DRB and contractors, self-monitoring and self-assessing to ensure [her] work efforts supported the performance goals and [were] of an acceptable quality." ECF 10-4 at 5. To the extent that these achievements were missing from her evaluation, the Court fails to see how they may have dramatically changed her evaluation scores. According to the Department's performance policy, work of acceptable quality and performance that met standards would still likely only amount to a "Results Achieved" rating and a numerical score of one. *See* ECF 8-7 at 6 (noting that "Results Achieved" is one level above "Unsatisfactory Results," equivalent to "Unacceptable" under OPM's regulations).

Taking a different tack, Kilby-Robb argues that Huh's stated reasons for his evaluation were suspect because the evaluation was inconsistent with his comments during their mid-year discussion, where he had assured her that she was on her way to an "outstanding review." ECF 10 at 23. She cites her own EEO affidavit, which states that Huh had "indicated that she was on the right track to reaching her goal of an outstanding rating," ECF 10-6 at 253; *see also id.* at 68, and her interrogatory responses, where she says that she had "many discussions with my first-line supervisors about a plan to obtain an 'outstanding' rating," and was "assured" that such a "rating

---

[7] There is evidence in the record indicating that Kilby-Robb indeed "submitted her accomplishments before the rating had occurred," as she alleges in her EEO affidavit. ECF 10-6 at 255. For example, Kilby-Robb's self-evaluation for her 2013 review states that she had included a "File Attachment" which included "descriptions of completed and continuous progress areas." *See* ECF 8-10 at 2. But Kilby-Robb does not cite to this document or identify it in the record, describe its contents, nor does she otherwise elaborate on what those accomplishments as listed in the attachment were or how they would have merited a higher rating.

was achievable," ECF 10-4 at 5. A judge in this district presiding over one of Kilby-Robb's prior lawsuits against the Department found similar evidence insufficient to demonstrate pretext in the face of the employer's "legitimate, non-discriminatory reasons for the . . . performance rating." *Kilby-Robb v. Devos*, 247 F. Supp. 3d 115, 123 (D.D.C. 2017). In that case, Kilby-Robb also claimed that she had received a discriminatory lower-than-anticipated performance rating, despite being told "during her mid-year review" that she was on track for a good performance review. *Id.* Kilby-Robb similarly "cite[d] only to her own declaration and her own EEO affidavit," and did "did not depose [her first-line supervisor] or Anderson about their performance ratings." *Id.* at 123–24. Here, the Department admits that Huh and Kilby-Robb had at least one mid-point discussion, ECF 8-1 ¶ 15, and does not directly contest Kilby-Robb's claim that Huh made this or similar statements, so the Court will view the evidence in Kilby-Robb's favor and assume that it is undisputed that he did so, *see* ECF 8 at 13; *see Steele*, 899 F.3d at 947.

But even so, the Court agrees with the Department that Huh's mid-year comments are not inconsistent with her final rating such as to allow a reasonable jury to find pretext. Statements by Huh that Kilby-Robb was on her way to a higher rating did not necessarily mean that she would successfully achieve a score of three by the end of the performance period. ECF 8 at 14; *see Simms v. Duffy*, No. 22-cv-2115, 2025 WL 823905, at *5 (D.D.C. Mar. 14, 2025) (granting defendant's motion for summary judgment where plaintiff's only argument to establish pretext regarding her poor performance review was to show that she had previously received positive evaluations); *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 101 (D.D.C. 2005) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories, or has, in the past, received some good evaluations." (quoting *Ezold v. Wolf, Block, Schorr, and Solis-Cohen*, 983 F.2d 509, 528 (3rd Cir.1992))), *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir.

18

2007). Further, even as relayed by Kilby-Robb, Huh's purported mid-year assessments, although "generally positive," are also "very short," "general," and "particularly brief," and describe her performance in "general terms without any specific examples of good work," meaning they are of limited value in contradicting Huh's subsequent detailed, end-of-year account of her performance. *Khan v. Holder*, 37 F. Supp. 3d 213, 228 (D.D.C. 2014); *id.* (finding that prior positive evaluations by coworkers did not "contradict [supervisor's] accounts of specific incidents where plaintiff failed to adequately perform").

Finally, Kilby-Robb argues that the Department's proffered reasoning is pretextual because two employees outside her protected class, Kristin Lundholm and Erin Pfeltz, were given higher performance ratings than she was. ECF 10 at 9, 20–21. Evidence of "more favorable treatment to similarly situated employees without the plaintiff's protected characteristic may indicate discriminatory animus." *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174 (D.C. Cir. 2021). To be similarly situated, "all of the relevant aspects of [a plaintiff's] employment situation [must be] nearly identical to those of the" comparator employees. *Id.*

The Department does not appear to dispute that Lundholm, Pfeltz, and Kilby-Robb were in some ways similarly situated, in that they shared similar job duties, were subject to the same evaluation process, were all evaluated by Huh, and were evaluated on at least two similar critical elements. ECF 8 at 10–11; ECF 12 at 6 n.2.[8] However, the record demonstrates that neither Lundholm or Pfeltz "work[ed] on the same . . . project[s] as" Kilby-Robb, and with respect to those projects "had different job responsibilities." *Robertson v. Dodaro*, 767 F. Supp. 2d 185, 196 (D.D.C. 2011). Further, in Pfeltz and Lundholm's reviews, Huh provided—as he did in Kilby-

---

[8] The Department notes that Lundholm and Pfeltz's critical elements were not identical to Kilby-Robb's, in that they did not have a "specific grants management element," but appears to concede that Lundholm and Pfeltz's "monitoring and technical assistance elements" were equivalent to Kilby-Robb's contract and data management elements. ECF 12 at 6 n.2.

Robb's review—detailed descriptions of Lundholm and Pfetlz's performances, specific goals achieved, and why the employee's performance was, in their cases, "exemplary" and "excellent." ECF 8-44 at 3–4; ECF 8-45 at 4, 6. As for Lundholm, her review notes that she handled a particularly "complex[]" portfolio of programs and her tasks were "complex and labor-intensive." ECF 8-44 at 3. Kilby-Robb does not dispute that Pfeltz and Lundholm handled different tasks than her and did so in an exemplary or excellent fashion. She points to nothing in the record to show that her performance was equal to if not better than the putative comparators. Nor does she establish that Huh mischaracterized the putative comparators' performances, and that, in reality, they performed worse than Huh stated in their evaluations. Thus, the Court finds that not "all of the relevant aspects" of Kilby-Robb's employment situation are nearly identical to those of the putative comparators. *Breiterman*, 15 F.4th at 1174.

Since Kilby-Robb has identified no evidence in the record sufficient to allow a reasonable jury to find that Huh's stated reasons for his evaluation were pretext for race and age discrimination, the Department is entitled to summary judgment on this issue.

### B.  Denial of Leave Restoration Request

Kilby-Robb next argues that she was subject to disparate treatment when the Department denied her request to restore her forfeited annual leave. ECF 10 at 11, 25. The Department denies that this decision was based on her race or age, and proffers a legitimate, nondiscriminatory reason for denying her request: Kilby-Robb "failed to follow the Department's procedures for restoring unused leave." ECF 8 at 15.

The Court finds that the Department's rationale is "facially credible in light of the proffered evidence." *Figueroa*, 923 F.3d at 1088. The Department argues that to restore leave under the Department's policies, Kilby-Robb was required to show that she had previously scheduled the

20

leave but her ability to use it was "denied because of exigencies (situations calling for immediate action or attention) of the public business." ECF 8-11 at 8. The Department argues that while Kilby-Robb claimed in her leave restoration request that she "had to forfeit approved leave in order to" complete certain time-sensitive assignments, ECF 8-16 at 2, Kilby-Robb's use of that leave was never denied by any supervisor, ECF 8 at 16. As Huh puts it in his departmental EEO affidavit, he "did not deny any leave requests," and thus there "was nothing to restore." ECF 8-4 at 7. Kilby-Robb has not disputed that Huh never denied any of her scheduled leave requests. ECF 8-1 ¶ 36; ECF 10-1 ¶ 36. This explanation is facially consistent with the Department's policies. ECF 8-11 at 8.

Further, under the Department's policies, restoration of leave also applied only to leave hours that had been scheduled prior to the end of the leave year, meaning prior to the January 11, 2014, cutoff deadline. ECF 8-11 at 8; ECF 8-1 ¶ 24. Kilby-Robb had also submitted requests to use leave beyond that January 11 deadline, and—although her briefing on this point is difficult to understand—appears to believe that the restoration of leave request was tied to her ability to use that scheduled leave in the new year.[9] ECF 10 at 26; *see* ECF 10-6 at 71. On this point, the Department argues that "Huh was not permitted by policy to restore annual leave for leave that had been requested outside of the 2013 leave year." ECF 8 at 17. The Department's contemporaneous justifications for its actions are also consistent with the leave policy: Liza Araujo told Kilby-Robb that a supervisor like Huh can only approve "a request to restore use or lose leave that was scheduled (and denied) *through January 11, 2014*." ECF 8-17 at 2 (emphasis added).

---

[9] It is not clear to the Court from either the briefing or the summary judgment record whether Kilby-Robb believed that her leave scheduled beyond January 11, 2014 was part of the leave that would itself be restored, or merely that as a result of her successful restoration of leave request, she would be able to use her restored leave hours for those post-January 11 dates. The distinction does not matter for the analysis given that under either scenario, Kilby-Robb's request would not have satisfied the Department's procedures.

21

Kilby-Robb fails to provide evidence on which a reasonable jury could find that the Department's rationale was pretextual. First, she argues that Huh's stated reasons are false because she received "assistance from multiple authoritative [Office of Innovation and Improvement] employees with knowledge of the leave restoration process" who assured her that she would be able to restore and use her leave as intended. ECF 10 at 26. Kilby-Robb cites to her own EEO affidavit, where she states that she received advice from "Cheryl Weekes and Charlene Riggans," who "input the information in the system to restore the leave." ECF 10-6 at 259. She also cites to a November 23, 2013 email between her and Charlene Riggans who provided her advice (relayed from Naomi Sanchez) regarding the entry of leave in the Department's system. ECF 12-1. But that email chain regards Kilby-Robb's scheduling of her "[u]se or [l]ose" leave before January 11. *Id.* The Court finds Kilby-Robb's citation to this email confusing, as it does not appear to contradict the Departmental policies which require that the employee's use of the leave be denied in order for the leave to be restored in the subsequent year. Further, the email states that Kilby-Robb "[p]lans to use all of her restored leave that is scheduled to expire by the end of December," implying that Kilby-Robb was in fact intending to use leave before the rollover deadline. *Id.* Kilby-Robb also cites this email for the proposition that on November 26, 2013, she sent her "leave restoration to Mr. Huh for approval based on Ms. Sanchez's directions." ECF 10 at 11. But Kilby-Robb does not dispute that she submitted the actual request for leave restoration in January 2014. *See* ECF 8-1 ¶ 33; ECF 10-1 ¶ 33. She thus appears to conflate an email and advice regarding the entry of her use-or-lose time *before* the January 11 deadline with getting advice about the actual approval of the leave restoration request itself. The Court does not find that this email could allow

a reasonable jury to find that the Department's stated reasons for its decision was pretextual.[10] *See Brady*, 520 F.3d at 495.

Kilby-Robb makes a number of other arguments for why Huh and Araujo's stated reason for denying the request was pretext for race and age discrimination, which all appear boil down to one claim: The denial was suspect because Margo Anderson was involved. First, Kilby-Robb states that Anderson was directly involved in denying her leave restoration request. ECF 10-6 at 253. Kilby-Robb claims that after Huh reversed his position on leave restoration, she spoke with Naomi Sanchez, who agreed to restore the leave, but Anderson refused to sign off on the request. *Id.* However, Kilby-Robb provides no evidence for the basis of her statements in her EEO affidavit regarding Sanchez's purported discussions with Anderson—such as any non-hearsay statements by Sanchez or Anderson—that would explain the source of her knowledge regarding Anderson's involvement or the scope of Anderson's participation in the leave decision. *See id.* There is some non-conclusory evidence that Anderson was indirectly involved in the decisionmaking around Kilby-Robb's leave request, given that Huh states that he believed Anderson was "aware of this situation," regarding Kilby-Robb's leave restoration request, but that Anderson "was not part of the decision process." ECF 8-4 at 8. Araujo states that she separately spoke with "Senior Officers as to how to handle" Kilby-Robb's request. ECF 8-6 at 4. Drawing inferences in Kilby-Robb's favor, as the Court is required to do on summary judgment, the Court assumes that Anderson— Huh's immediate supervisor—was one of those officers. But even assuming that Anderson had

---

[10] Even were it true that this email chain demonstrated that the Department's policies actually permitted the type of restoration of leave request that Kilby-Robb made, and Huh and Araujo's interpretation of the policies was wrong, this would not necessarily be evidence of discriminatory intent. "[T]he issue is not the correctness or desirability of the reasons offered[,] but whether the employer honestly believes in the reasons it offers." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). "[T]he fact that a proffered reason is objectively false may undermine an employer's professed honest belief in that reason, but this is not always so." *Id.*

some role in discussing the leave request, Kilby-Robb has not presented any evidence beyond her own speculation to demonstrate what exactly Anderson's involvement entailed, let alone establish ways that Anderson's influence on Huh and Araujo's decisions was motivated by discriminatory animus. *See Furey v. Mnuchin*, 334 F. Supp. 3d 148, 162 (D.D.C. 2018) ("The plaintiff must identify evidence from which a reasonable jury could find that the employer's stated reasons were 'phony.'" (quoting *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996))).[11]

Finally, Kilby-Robb claims that Anderson approved leave restoration requests for four similarly situated employees outside her protected classes while denying hers. ECF 10 at 28. Again, assuming that Anderson played some role in denying Kilby-Robb's request, the comparison fails and cannot support a finding of pretext because these employees were not similarly situated to Kilby-Robb in that they followed the correct process for restoring leave. *See Breiterman*, 15 F.4th at 1174. While their immediate supervisors had originally granted the employees' requests for leave, these employees were later informed that they could no longer use their leave due to emergency office needs.[12] ECF 8 at 18; *see* ECF 8-18 at 3 (Liza Araujo's pre-approved leave was denied by a supervisor, because she "need[ed] [her] in the office the next week to transition to the position of executive officer"); ECF 8-19 at 2–3 (Tawanna Colbert Coles' pre-approved leave was denied by Patricia Knight to "assist the transition to a new Executive Officer");

---

[11] Kilby-Robb's focus on Anderson likely is based on Kilby-Robb's belief that Anderson "hated her" and previously made statements reflecting her "discriminatory biases." ECF 10 at 4, 13. But unlike with her 2013 performance rating claim, Kilby-Robb makes no attempt to show how any purported "direct evidence" of prior discrimination by Anderson was connected with the purported denial of the leave request. ECF 10 at 22.

[12] The Department notes as a secondary point, and the Court agrees, that three of the four employees whose leave restoration requests were approved were also African American, thus "weakening an inference of discrimination" on the basis of race. *Abbott v. Greer*, No. 22-cv-2717, 2025 WL 2029766, at *7 (D.D.C. July 21, 2025); *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (finding that the evidence "cuts strongly against any inference of discrimination" when the defendant replaced an African American plaintiff with another African American employee); *see* ECF 8 at 18. This argument of course does not address whether the Department discriminated against Kilby-Robb due to her age. Regardless, the Court need not consider this argument since it finds that the putative comparators are not similarly situated.

24

ECF 8-20 at 2–3 (Charlene Riggans' pre-approved leave was denied by Araujo because Riggans was needed "in the office [to] process exit packages for retirees"); ECF 8-21 at 2 (Ann Margaret Owens' pre-approved leave was denied by Patricia Knight because Owens was required to "help in the transition to a new Executive Officer"). Kilby-Robb is unable to present any such documentation because no agency authority asked her to come into the office on the days she had requested leave. *See* ECF 8-15. Therefore, the Court cannot find the four putative comparators to be similarly situated.

Since Kilby-Robb has identified no evidence in the record to suggest that the denial of her leave restoration request was pretextual, the Department is entitled to summary judgment on this issue.

### C.  Denial of Teleworking Request

Kilby-Robb also argues that the Department discriminated against her on the basis of race and age when Huh denied her request to telework an additional day of the week. ECF 10 at 29. The Department argues that this claim fails because denial of telework opportunities is not an adverse action, and because Huh had a legitimate, non-discriminatory reason for denying the request. ECF 8 at 18–19. The Court need not resolve the adverse action question, because even assuming the decision was an adverse action, the Court agrees with the Department that Kilby-Robb has not presented evidence sufficient for a reasonable jury to find that Huh's stated reason for denying the request—that the policy in the CSP division required employees to be in the office a minimum three days per week—was pretext for race and age discrimination.

The Department proffers a legitimate, non-discriminatory reason for Huh's decision to deny Kilby-Robb an additional day of telework: the Flexiplace Program allowed supervisors to individually determine the number of days an employee would be allowed to telework, and Huh

believed that having employees on-site three days a week was "more conducive to executing [CSP's] mission, working with teams, [and] communicating face to face." ECF 8-4 at 9. Huh's explanation is "facially credible in light of the proffered evidence" in the record. *See Figueroa*, 923 F.3d at 1088. The Department's Flexiplace Program guide states that the employee's request to participate in telework must be approved by the supervisor. ECF 8-22 at 4. Suitability for the telework program depends on the characteristics of the employee and the nature of the position, taking into account factors such as whether the position requires "daily face-to-face contact with the supervisor, [or] other employees." *Id.* at 7. The program guidelines indicate that even if the position is approved for telework, the amount of weekly telework time is discretionary on the part of the supervisor, and anticipate that "[w]ork away from the office will vary depending upon the individual arrangements between employees and their supervisors." *Id.* at 8.

Kilby-Robb first disputes Huh's statement that the CSP division had a general policy that employees be in person three days a week. ECF 10 at 31. She points to another employee in the Office of Innovation and Improvement, Christina Miller, who was allowed to telework more than two days a week. *Id.* But Miller was not part of the CSP division, nor under Huh's supervision, meaning that her work arrangement does not undermine the existence of a general policy for employees in CSP. ECF 10-6 at 109; ECF 8-4 at 10; ECF 12-4 at 1–2. For those reasons, Miller, despite being a Caucasian woman younger than Kilby-Robb, is also not a suitable comparator for the purposes of demonstrating that Huh treated younger, non-Black employees better than Kilby-Robb. Kilby-Robb also identifies Soumya Sathya, a South Asian supervisee of Huh's that was younger than Kilby-Robb, as someone who was allowed to telework two days a week. ECF 10 at 32. But Sathya is also not a proper comparator for proving disparate treatment, nor does the fact that she worked remote two days a week undermine the existence of the three-day CSP policy.

26

Unlike Kilby-Robb, who worked a compressed four-day-a-week schedule, Sathya worked five-day work weeks. *See* ECF 8-23; ECF 8-25. Allowing Sathya an additional day of telework did not violate the purported CSP practice, whereas allowing Kilby-Robb's additional day of telework would mean she was in the office for only two days.

Kilby-Robb attempts to bolster her comparator argument by claiming that Anderson, rather than Huh, "ultimately made the decision to deny Plaintiff's request for additional telework," and that "Anderson herself approved Ms. Miller's telework schedule." ECF 10 at 32. The Court finds Kilby-Robb's argument to carry little weight for multiple reasons. First, the notion that Anderson, rather than Huh, denied the requests in both cases runs counter to the guidelines, which places initial decisions to approve or disapprove telework requests with the first-line supervisor. ECF 8-22 at 4. While the guidelines also state and the Department concedes that an approving official must ultimately "review and approve Flexiplace work agreements" arrived at between the employee and immediate supervisor, *id.* at 6; ECF 8 at 17, Kilby-Robb has not provided any evidence that Huh's role was somehow supplanted or circumvented. This makes sense: If Huh had indeed denied her request in the first instance, under the guidelines, Anderson would have had no role to play in the decision. Kilby-Robb cites to Huh's statements in his EEO affidavit, but those statements show that Huh said that Anderson "was not involved in denying" the request, although he "kept her aware" of it. ECF 10-6 at 93. Anderson also attests that she never even saw Kilby-Robb's written request and did not weigh in either way when Huh told her about it. ECF 8-5 at 8.

In response, Kilby-Robb cites only to a statement in her own EEO investigative affidavit, where she mentions a team meeting where Huh allegedly stated that he "saw no reason employees could not telework more," which Kilby-Robb construes as an admission that Anderson, rather than Huh, was setting the three-day-a-week policy for CSP workers. ECF 10 at 31; ECF 10-6 at 253.

27

While a plaintiff is entitled to rely on affidavits in generating a dispute of fact for the purposes of opposing summary judgment, the Court is not required to rely on affidavits that are "so conclusory and lacking in factual specificity that they cannot create genuine disputes of material fact at summary judgment." *Mokhtar*, 83 F. Supp. 3d at 61 (citing *Meijer v. Biovail Corp.*, 533 F.3d 857, 865 (D.C. Cir. 2008)); *see also Ginger*, 527 F.3d at 1347 (declining to find allegations probative of discrimination when the "allegations [were] vague and even those that should have left a paper trail are unsupported by any documentary evidence"). And even if Huh had made this statement, the Court does not find it probative evidence that his stated reason for denying the telework request was false and the real reason was discrimination. Huh's opinion that employees could telework "more" is not the same as saying that he approved of a situation where an employee was only in the office for two days (as Kilby-Robb preferred), nor is it an admission that he was not making telework decisions in the CSP division. Kilby-Robb has thus failed to present evidence establishing that Huh did not have discretion to enforce a policy particular to CSP employees, such that a reasonable jury could find that Huh's stated reason for his decision was pretextual. *See Brady*, 520 F.3d at 495.

### D. Non-selection

Kilby-Robb argues that she was not hired for three vacant positions because the Department discriminated against her based on her race and age. ECF 10 at 33–45. For each of the three positions discussed below, the Department articulates a legitimate, non-discriminatory reason for the employment action: namely, that the ultimately chosen candidate was more qualified for the position than Kilby-Robb was. ECF 8 at 23, 31, 36; *see Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006) (finding that a "qualifications-based justification constitutes a legitimate, nondiscriminatory reason for the allegedly discriminatory action"). A plaintiff can attack a

qualifications-based justification in two ways. *Jeffries v. Barr*, 965 F.3d 843, 861–62 (D.C. Cir. 2020). The employee can show that a "reasonable employer would have found the plaintiff *significantly* better qualified for the job" but still chose to hire someone else. *Holcomb,* 433 F.3d at 897. Or, the employee can "expose other flaws in the employer's explanation" by showing that the employer's justification was not only a mistake, but "a lie." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 n.3, 1295 (D.C. Cir. 1998). The Court addresses the three failures to hire in turn and finds that the Department is entitled to summary judgment on each.

### 1. OII-2014-0014

The Department contends that Kilby-Robb was not selected for this position because she did not have the requisite skills required for the job. ECF 8 at 23. Kilby-Robb argues that Owens, who was ultimately chosen for the position, "lack[ed] the necessary qualifications" while Kilby-Robb had at least some relevant experience, making her a better candidate. ECF 10 at 36; *see* ECF 8-26. Kilby-Robb also argues that the Department deviated from standard hiring procedures in considering her application, and that Owens was "pre-select[ed]" for the position under circumstances that raise an inference of pretext. ECF 10 at 36.

First, the Court finds that Kilby-Robb has not shown that the qualifications gap between her and Owens was "great enough" for her non-selection "to be inherently indicative of discrimination." *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012). The Department, comparing the job listing's requirements to both Kilby-Robb and Owen's resumes, offers several reasons Owens was the better qualified candidate—Owens had experience handling FOIA requests, while Kilby-Robb did not; Owens was already performing many of the same budget-related duties needed for the job in her current position, while Kilby-Robb only had experience in handling school budgets; Owens served as a team lead to manage web reports, while Kilby-Robb

did not have experience leading teams on webpage development. *See* ECF 8-26; ECF 8-47; ECF 8-48; ECF 8 at 25–26.

In response, Kilby-Robb attacks Owens' experience listed in her resume, stating that Owens has "failed to identify a single instance in which she planned a program or was involved in strategic planning," while noting, in contrast, that she "at least had specific budget management experience in a school setting." ECF 10 at 36. She also notes that she had over twenty-five years of experience in "management and strategic planning" while pointing to several accomplishments in her resume. ECF 10 at 35. The "fact that [an applicant] had more years of experience . . . does not mean that she was more qualified for the position." *Grosdidier v. Chairman, Broadcasting Bd. of Governors*, 774 F. Supp. 2d 76, 102 (D.D.C. 2011); *see Waters v. Gonzales*, 374 F. Supp. 2d 187, 196 (D.D.C. 2005) (finding that better education and longer tenure does not mean that plaintiff is automatically more qualified for a position). Kilby-Robb fails to cite any evidence in the record disputing the Department's contentions about her lack of experience in developing budgets unrelated to schools, handing FOIA requests, or web-development. Instead, she asserts that if the Department found her underqualified, it should have similarly found that Owens was also underqualified for the position. ECF 10 at 36–37. But that is not the relevant legal standard the Court utilizes in assessing qualifications-based justifications. *See Holcomb*, 433 F.3d at 897. Even assuming a jury could agree that both Owens and Kilby-Robb were similarly qualified, or perhaps that both were underqualified for the position, Kilby-Robb's evidence falls well short of establishing that she was "significantly better qualified." *Id.; Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007) (acknowledging that, while the plaintiff's evidence showed the plaintiff could have received "somewhat higher scores" while the chosen candidate could have received "somewhat lower scores," that finding was insufficient to conclude that plaintiff was "discernibly

better"). And contrary to Kilby-Robb's claims, Owens' resume does display examples of work that corroborates her stated experience of "provid[ing] guidance and leadership to [Office of Innovation and Improvement] staff for strategic and program planning," such as her experience "advis[ing] program staff on necessary changes to" materials reviewed by the Secretary. ECF 8-47 at 2. Further, the vacancy description defines specialized experience in "strategic and program planning, budget development, and management operations" as including "studying the impact of legislation and regulations on a program." ECF 8-26 at 3. Owens' resume indicates that she did just that when she "[i]nterpreted and applied legislation, requirements, guidelines, and policies" as a "program lead" in a "$300 million" federal grant program. ECF 8-47 at 3.

Next, Kilby-Robb asserts several ways in which the Department purportedly deviated from standard hiring procedure. An employer's deviation from standard hiring procedures can be probative of pretext if plaintiff can show that the deviation was motivated by discrimination. *See Fischbach*, 86 F.3d at 1183–84. The Department's hiring policy states that "the best qualified of the candidates rated and ranked . . . will be referred . . . to the selecting official for consideration." ECF 8-27 at 16. However, to be rated and ranked, the candidate must be "[q]ualified." *Id.* at 15. Kilby-Robb argues that by failing to rate, rank, and pass on her application, Ralidak violated various policies, including the Department's hiring guidelines, the Collective Bargaining Agreement (CBA). *See* ECF 10 at 16, 34, 37. But the record demonstrates that Ralidak did in fact pass along the only candidate that she deemed qualified for the position. Ralidak states that she did not pass along Kilby-Robb's application because she found her to be "not qualified." ECF 8-28 at 6; *see also* ECF 10-6 at 186. Kilby-Robb's procedural argument is in reality a rehash of her claim that she was qualified for the position. But discussed above, Kilby-Robb has not presented evidence that she had relevant experience for a variety of the responsibilities listed in the job

description. And even had Ralidak failed to follow procedures or misstated Kilby-Robb's qualifications when determining that she was not qualified for the position, Kilby-Robb has conceded that Ralidak did not know Kilby-Robb's race, color, or age when screening out her application, ECF 8-1 ¶ 61; ECF 10-1 ¶ 61, undermining the possibility that her screening out of the application was due to Kilby-Robb's protected characteristics.

Finally, Kilby-Robb argues that she was set up to fail, in that the job description was "tailored to one employee" and that the official who eventually approved Owens' application, Liza Araujo, discriminatorily structured the process to preselect Owens at the behest of Margo Anderson. *See* ECF 10 at 34; ECF 10-1 ¶ 57 ("Owens was pre-selected for the . . . [p]osition and [the] selection procedure raises an inference of pretext."). The Court finds this final attempt at showing pretext unavailing. To be clear, employers are free to preselect candidates so long as they are not doing so based on discriminatory motives. *See Jeffries*, 965 F.3d at 863. But Kilby-Robb does not proffer evidence beyond her own "unsubstantiated speculation" that this was the case for Owens. *Id.* First, she argues that there is evidence of preselection because Owens was the only candidate referred. ECF 10 at 36. But again, the record does not reflect that Ralidak was obliged to pass along Kilby-Robb's application. Second, she claims that the job description "closely assigned [sic] with [Owens'] duties." ECF 10-1 ¶ 57. But Kilby-Robb does not present any evidence showing that this was because of any deliberate intent to disadvantage Kilby-Robb or any other candidates, such as evidence showing that specific "changes were made to the position's" description prior to posting that would benefit Owens over Kilby-Robb. *Jeffries*, 965 F.3d at 864.

Kilby-Robb makes one final go at it, citing to evidence that Liza Araujo was involved in the process of approving the vacancy posting and signing off on Owens' promotion after Ralidak found her qualified. *See* ECF 8-1 ¶ 55 (noting the undisputed fact that Liza Araujo was the selecting

32

official for the position); ECF 10-2 at 38 (email reflecting that Araujo was sent drafts of the relevant job postings, although not indicating that she made any revisions or edits to those postings). Even assuming that Araujo was involved in the selection of Owens and the posting of the vacancies, the cited evidence does not demonstrate any reason to think that Araujo designed the vacancy with Owens in mind, let alone that her intent in doing so was discriminatory. Kilby-Robb goes further afield when she suggests that the purported preselection of Owens was due to Anderson's involvement, on the grounds that "Anderson asserted her influence on [Office] employees to act on her behalf." ECF 10-1 ¶ 62. But the only evidence that she cites for this claim is a report regarding issues with favoritism at the Office of Innovation and Improvement, which includes no statements by Anderson or any credited employees. *Id.* (citing ECF 10-3 at 12). The Court cannot find that this evidence, involving general, unsubstantiated allegations from unnamed individuals at the Department supports a finding that Anderson instructed Araujo to engage in preselection, discriminatory or otherwise, with this specific hiring decision. In a similar vein, Kilby-Robb also cites to the affidavit of another employee involved in departmental hiring who stated that Araujo and Anderson were the final approvers for the open positions. ECF 10-1 ¶ 62; ECF 8-39 at 6. But the possibility that Anderson may have had the ultimate say regarding promotion of a candidate who made it through the rating and ranking process provides no evidence to support that Anderson somehow influenced Ralidak's decision on the front end to screen out Kilby-Robb's application for this position, or that Anderson was involved in any discriminatory structuring of the vacancy itself. Because Kilby-Robb has not provided evidence that would be sufficient for a reasonable jury to conclude that the rejection of her application was mere pretext, her claim based on this vacancy fails as a matter of law.

### 2. *OII-2014-0012*

Moving to the next position for which Kilby-Robb was rejected, the Department contends that Kilby-Robb was not selected for position OII-2014-0012 because she did not possess "specialized experience at the GS-13 level . . . representing a Federal agency on place-based interagency initiatives," an essential qualification listed in the job posting, while the selected candidate Jane Hodgdon did. ECF 8 at 31; *see* ECF 8-32 at 3; ECF 8-51 at 5. Question two on the job application was about whether the applicant had "at least one year of specialized experience representing a Federal agency on place-based interagency initiatives and analyzing and developing Federal education legislation and policies that seek to transform low-income neighborhoods." ECF 8-32 at 6. Kilby-Robb answered "No." ECF 8-51 at 5.

Kilby-Robb does not present evidence sufficient to allow a reasonable jury to find that this legitimate, nondiscriminatory reason for rejecting her application was pretext for discrimination. *See Brady*, 520 F.3d at 495. Kilby-Robb fights an uphill battle, given that she does not contest that having one year of experience with representing a federal agency on place-based interagency initiatives and developing federal education legislation was one of the "eligibility requirements for the position," according to Ralidak, who was again the screening official for the vacancy. ECF 8-28 at 9. Despite answering "no" to the question about place-based interagency initiatives and developing federal education legislation, Kilby-Robb argues that she was nevertheless significantly more qualified than Hodgdon. ECF 10 at 38. She points to her answer to a different question on the application, where she stated that she had "experience analyzing and developing federal education policies that seek to transform low-income neighborhoods." ECF 8-51 at 6. But the latter experience does not involve representing federal agencies on place-based interagency

initiatives, and her answer to the latter question cannot serve to show that she met the requirements of the role, let alone was substantially more qualified than Hodgdon.

Kilby-Robb argues that the Department focused narrowly on her answer to question two, and should have evaluated her application more holistically. She notes that she had worked at the Office of Innovation and Improvement for fifteen years prior to applying for this position and points to her accomplishments as a school administrator. *See* ECF 10 at 38; ECF 8-51 at 11–23 (Kilby-Robb's resume as submitted for this position). But an employee need not be qualified for a particular position simply because they have had several years of general experience. *See Grosdidier*, 774 F. Supp. 2d at 102–03. And this Court may not typically "second-guess how an employer weighs particular factors in the hiring decision." *Jackson*, 496 F.3d at 709; *Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) ("Courts must defer to the employer's decision as to which qualities [are] required by the job."). The Department provides various reasons why, notwithstanding the fact that Kilby-Robb was automatically screened out because of her answer to question two, Hodgdon was the better qualified candidate. To name a few of the Department's reasons: Hodgdon's application showed her leadership skills while working on federal place-based initiatives, ECF 8-52 at 2, while Kilby Robb's did not, ECF 8-51 at 5; Hodgdon's "central task" included representing the Department on interagency initiatives, ECF 8 at 34; ECF 8-52 at 2–5, while Kilby-Robb's resume only showed one instance where she represented the "Clinton Administration's initiative" as part of a team effort, ECF 8 at 33; *see* ECF 8-51 at 21. Kilby-Robb points to no evidence in the record refuting the Department's argument that Hodgdon exhibited several qualifications and skills required for the position. Thus, the Court agrees with the Department that Kilby-Robb has not provided evidence showing that she was "significantly better qualified" for the position. ECF 8 at 36; *see Holcomb*, 433 F.3d at 897.

Kilby-Robb again falls back on the argument that the Department's justification was pretextual because Hodgdon was preselected for the position. ECF 10 at 41, but she again fails to present any evidence showing that Hodgdon was preselected, let alone that the preselection was motivated by discrimination. She points to the fact that Hodgdon was the only candidate found eligible for the position out of the eight that applied, given that she was the only one with the requisite "specialized experience" described in question two of the application. ECF 8-28 at 8; *see* ECF 10 at 41. But Kilby-Robb again provides no evidence showing that any of the individuals involved with drafting the job description did so in a way to ensure that Hodgdon would fill the vacancy. She also notes that Hodgdon was "offered the position within a month after she applied," implying that the short turnaround between the application process and selection creates an inference of preselection. ECF 10 at 41. It does not. And even if it does, Kilby-Robb presents no evidence to suggest that Hodgdon's preselection was motivated by discrimination.[13]

### 3.  OII-2014-0016

Unlike the prior two positions, Kilby-Robb advanced to the interview round for the Management and Program Specialist position, but Jeanne Gilroy was eventually selected. ECF 8-1 ¶¶ 84, 85, 92. The Department again proffers a legitimate, nondiscriminatory reason: Gilroy was the stronger candidate. ECF 8 at 36. Kilby-Robb's approach to discredit this rationale should be familiar by now: She argues that she had more experience than Gilroy for the position, and that the interview panel would have found her to be the most qualified had the position not been

---

[13] Kilby-Robb again implies that the purported preselection process was either directly or indirectly due to the influence of Anderson, claiming employees were aware that under Anderson "only young Caucasians were selected" for job vacancies. ECF 10 at 41. The Court again declines to give weight to this conclusory allegation. And even if it did, Kilby-Robb again fails to provide any evidence showing how that pressure may have been exerted or how it affected the actions of the various officials involved with drawing up the vacancy announcement and selecting Hodgdon to the position. Kilby-Robb also does not dispute that Anna Hinton, an African American woman, rather than Anderson, was the selecting official for this position. ECF 8-1 ¶ 70; ECF 10-1 ¶ 70.

specifically tailored to Gilroy's resume and experience. ECF 10 at 42–45. Neither tack is supported by the evidence in the record.

First, Kilby-Robb again fails to show how she was "significantly better qualified." *Holcomb*, 433 F.3d at 897. The Department concedes that Kilby-Robb and Gilroy had similar relevant experience in "tracking, reviewing, and analyzing data" and "providing technical assistance for grantees." ECF 8 at 42–43. Yet the Department points to notes written by the interview panel members, who stated that when asked about those skills, Kilby-Robb provided only vague examples of her skills or gave nonresponsive answers. *See* ECF 8-55 at 2–3. Further, when asked about tasks related to the Opportunity Scholarship Program (OSP)—the main focus of the vacancy—Kilby-Robb also provided nonresponsive answers and failed to "demonstrate a clear understanding and knowledge of the OSP or other school choice or voucher programs," and failed to "demonstrate her ability to perform [budget preparation tasks] for the OSP." *Id.* at 2. Kilby-Robb does not rebut the reviewers' claims of vague and irrelevant responses to questions during her interview. Nor does she dispute the interviewers' general comments that Gilroy had more "direct experience" suited for the position, ECF 10 at 43, or otherwise present evidence that the interviewers were themselves motivated by discriminatory animus in their decision. The Court cannot find that she was significantly more qualified for the position such that Gilroy's selection would allow a jury to find pretext.

Instead, Kilby-Robb argues that the interviewers were primed to find that Gilroy had more direct experience with respect to the OSP-specific job duties because Gilroy was pre-selected for the position. ECF 10 at 44. But this does not undermine the panel's feedback regarding Kilby-Robb's vague and nonresponsive answers to questions about data tracking, grant management, and writing skills, areas which were not specific to the OSP role or Gilroy's prior duties, and thus not

ones that, even under a preselection theory, Gilroy necessarily had more direct experience in than Kilby-Robb.

Her preselection argument also fails. She asserts that Gilroy was preselected by pointing to the language in the job posting, which the Court acknowledges mirrors language in Gilroy's resume. ECF 8-37; ECF 8-53 at 3; ECF 10 at 43. She also notes that Gilroy was bound to perform better in the interview because the posting regarded management of the OSP program, and Gilroy was the only program officer for OSP. ECF 10 at 44; *see* ECF 8-37; ECF 8-53 at 3. But even if there was preselection involved, Kilby-Robb has not presented any evidence that it was motivated by discrimination. *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005) ("[P]laintiff's pre-selection claim does not advance her case for pretext unless she produces some evidence that discrimination played a role in [the] pre-selection."). Kilby-Robb claims that the selecting official for the position, Anna Hinton, who helped draft the posting, helped to interview the candidates, and was the selecting official for the role, was once named in one of Kilby-Robb's EEO complaints. ECF 10 at 17. But beyond insinuating that Hinton—who is younger than Kilby-Robb but is also African American, ECF 10-6 at 5—would have some animus against her, Kilby-Robb does not provide any evidence showing that Hinton structured the vacancy the way she did as a result of race or age discrimination. Finally, her speculative claims that Araujo and Anderson "authorized the position to be created at Gilroy's previous position, just at the GS-14 level" is again unsupported by any evidence in the record. ECF 10 at 43. The only evidence that Kilby-Robb cites again shows that Araujo played a role in approving the three posted vacancies, ECF 10-2 at 38, and that Anderson may in general have had a role in approving selected candidates, ECF 8-38 at 6. But this evidence cannot be reasonably construed as showing that Araujo and Anderson deliberately instructed Hinton to pre-select Gilroy, or that they did so discriminatorily, or that

38

Hinton was somehow trying to satisfy Anderson's purportedly discriminatory preferences of her own accord.

In sum, the Department produced evidence of a legitimate, nondiscriminatory reason for this, and all the other actions at issue. Kilby-Robb has failed to put forward sufficient evidence for a reasonable jury to find that the employer's legitimate, non-discriminatory reasons were not the actual reasons for the Department's decisions, and that the Department intentionally discriminated against her on the basis of race and age. The Department is entitled to summary judgment on her claims. *See Brady*, 520 F.3d at 496–97.

\* \* \*

For the foregoing reasons, the Department's motion for summary judgment, ECF 8, is **GRANTED** as to all of Kilby-Robb's claims, and the case is **DISMISSED**.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: March 31, 2026

39